United States District Court

For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

ERNESTO ABORDO, et al,                     No   C  04-4541  VRW

          Plaintiffs,                      ORDER

          v

JOHN E POTTER, United States
Postmaster General,

          Defendant.
_____/

          This case involves claims of employment discrimination
and retaliation brought by twenty-eight former "special delivery"
mail carriers in the San Francisco branch of the United States
Postal Service (USPS).  Defendant John Potter (the "Postmaster")
moves for partial summary judgment on plantiffs' claims for age
discrimination and retaliation.  Doc #22 (MSJ).  For reasons
discussed below, the Postmaster's motion is GRANTED.

//

//

//

**United States District Court**
For the Northern District of California

I

A

In 1885, Congress provided

[t]hat a special stamp of the face valuation of ten cents may be provided and issued, * * * which, when attached to a letter, in addition to the lawful postage thereon, * * * shall be regarded as entitling such letter to immediate delivery within the carrier limit of any free delivery office which may be designated by the Postmaster-General as a special delivery office * * *.

Act of March 3, 1885, 48th Cong, 2d Sess, 23 Stat 385, 387-88. Thus began "special delivery" mail (SDM). At the time SDM was introduced, mail arrived at post offices throughout the day, often after letter carriers had departed for routine deliveries. Doc #19, Ex C at 138. If a customer chose SDM service, SDM messengers delivered the item to its ultimate destination on the same day it arrived at the local post office, regardless whether the regular letter carriers had already begun their routes. Id at 138-39. Plaintiffs are SDM messengers who comprised the single SDM unit that existed in San Francisco prior to 1991. Doc #41, Ex 10 at 9.

In 1991, USPS decentralized the San Francisco SDM unit into four separate units, which provoked a flurry of Equal Employment Opportunity (EEO) complaints for retaliation and various types of discrimination (the "EEO actions"). Doc #19, Ex A at 2. These individual claims, however, were stayed pending arbitration of a "class action" grievance (the "class arbitration") brought by the American Postal Workers Union (APWU) before arbitrator William Eaton. Id at 3. Although none of the aforementioned proceedings shares a procedural connection with the instant suit, plaintiffs' participation in them does form one basis for the retaliation

claims at bar.

By FY 1996, demand for the SDM service had fallen to 208,000 items delivered from a peak of 110 million items delivered in FY 1970. Id, Ex C at 139, 140-41, 1463. This decline coincided with the rise in popularity of other services, such as express mail, as well as improvements in the first-class and priority mail services. Id at 140. Due to these improvements, by the 1990s regular letter carriers were often delivering SDM items in the normal course of their routes. Id, Ex D at 122.

In 1997, citing the decline in SDM volume, USPS recommended to the Postal Rate Commission (PRC) that SDM service be eliminated. See id, Ex C. In a report issued on April 2, 1997, the PRC found that, under established cost attribution methods, SDM revenues for FY 1996 covered only 94.3% of SDM costs. Id, Ex C at 138. Using cost methods proposed by USPS, however, it found that SDM revenues exceeded attributable costs with a cost coverage of 119%. Id. But the PRC also found that eliminating the SDM service would result in a net gain of $400,000 per year, as approximately one-half of SDM customers would switch to the more-efficient express mail service. Id at 142-43.

The PRC therefore recommended that SDM be eliminated. Id at 149. On May 5, 1997, the USPS Board of Governors approved the PRC's recommendation, setting an implementation date of June 8, 1997. Doc #20 (Leon Decl), Ex B at 8, 10. USPS announced the elimination of SDM in its May 22, 1997, bulletin. Id.

//

//

//

3

1

United States District Court

For the Northern District of California

B

2          The process of eliminating the SDM service in the San
3  Francisco units, which began in June 1997, coincided with events in
4  the 1991 class arbitration and EEO actions so as to give rise to
5  plaintiffs' present retaliation claim.

6          First, on June 2, 1997, William Leon, then-manager of
7  customer service for USPS in San Francisco, began coordinating the
8  annual SDM unit review at the direction of San Francisco Postmaster
9  George Kikuchi.  Leon Decl ¶¶1, 4-5.  Leon found that, since the
10  elimination of the SDM service, San Francisco's thirty full-time
11  and seven part-time SDM messengers were mainly delivering express
12  mail and some international mail.  Id ¶¶7-8.  But because regular
13  letter carriers were primarily responsible for delivering express
14  mail, there was very little express mail for the SDM messengers to
15  deliver.  Id ¶¶11-14; id, Ex H.  For example, Leon found that "the
16  average total daily mail volume for all four special delivery units
17  on a weekday or Saturday was only 428 pieces of mail."  Id ¶11.
18  This volume amounted to seventeen pieces of mail per full-time
19  employee per workday, or 3.52 pieces per hour.  Id ¶¶11-12.  Leon
20  calculated that USPS could save approximately $220,000 in annual
21  vehicle costs and $583,917 in annual labor costs by having regular
22  letter carriers deliver the express mail that the SDM messengers
23  were then delivering.  Id ¶¶18-19.  Moreover, USPS domestic mail
24  manual DM-201 states that regular mail carriers are to deliver
25  express mail in the course of their normal routes, and that SDM
26  messengers should only deliver express mail if they do so in the
27  course of delivering SDM items.  Id ¶21; Doc #41, Ex 9-23 at 23.
28  //

4

United States District Court

For the Northern District of California

On June 8, 1997, the same day that the elimination of SDM took effect, USPS declared a national moratorium on abolishing the SDM "craft" pending the outcome of negotiations between USPS and the APWU concerning the merger of the SDM craft into the clerk craft.  Doc #41, Ex 10 at 11-12.  Linda Shumate, of the USPS Pacific Area Labor Relations Office learned of this moratorium in June of 1997 and informed the various districts in the Pacific Area of it, including the San Francisco district.  Id at 12.

C

On June 10, 1997 — eight days after Leon began conducting the SDM unit review and two days after SDM was abolished — Eaton issued his award in the class arbitration (the "Eaton award").  Eaton found that USPS violated sections of the collective bargaining agreement by failing to perform a "unit review" and to provide sufficient "analytical justification" for the decentralization.  Doc #19, Ex B at 50, 52-53.  But he refused to order a reconsolidation of the San Francisco SDM unit, having found that the decentralization itself was a legitimate operation.  Id, Ex A at 3.

Apparently dissatisfied with the Eaton award, on June 23, 1997, in a letter copied to George Kikuchi, the individual EEO complainants notified USPS labor relations manager Stephen Bushelman of their intent to reinstate the 1991 EEO actions, Doc #24, Ex 4, which, as noted, had been stayed pending the class arbitration.  Twenty of those complainants are plaintiffs in the present action.

//

United States District Court

For the Northern District of California

1    On July 9, 1999, the EEOC administrative judges concluded

2    that the complainants could not establish claims for

3    discrimination.  Doc #19, Ex A at 3.  Those complainants sought

4    review in federal court in this district, <u>Black v Henderson</u>, C-99-

5    4806 SBA (ND Cal), and on September 23, 2002, Judge Armstrong

6    granted the Postmaster's motion for summary judgment, concluding

7    that (1) USPS had offered legitimate, nondiscriminatory

8    justifications for decentralization (decreasing messengers' travel

9    time and increasing efficiency), (2) plaintiffs had presented

10   insufficient statistical evidence to show disparate impact and (3)

11   plaintiffs had failed to make a *prima facie* case for disability

12   discrimination, racial discrimination and retaliation.  Id at 12-

13   14, 19, 20-22.  The Ninth Circuit affirmed in an unpublished

14   disposition.  See Doc #127 (99-4806).

15

16                                    D

17   Meanwhile, three weeks after the EEO complainants

18   expressed their intent to reinstate the EEO actions, on July 16,

19   1997, the San Francisco SDM unit was abolished and all SDM

20   messengers, including plaintiffs, were sent to perform mail

21   processing duties at the San Francisco processing and distribution

22   center (P&DC).  Doc #41, Ex 10 at 14.  The following day,

23   plaintiffs received letters stating that they would remain in the

24   SDM craft pending ongoing discussions between USPS and the APWU but

25   that they would remain detailed to the P&DC until their

26   reassignment to the clerk craft was official.  Id.

27   Plaintiffs were not satisfied with their reassignment to

28   the P&DC.  In their first amended complaint, plaintiffs allege that

United States District Court

For the Northern District of California

their new jobs were "menial" and "required no skill" and that the P&DC was the "least desirable facility in San Francisco" with "absolutely filthy" restrooms.  Doc #14 (FAC) ¶¶54-55.  Plaintiffs further allege that they had difficulty breathing "because of the extraordinary amount of dust in the air."  Id ¶55.

Plaintiffs in this action filed formal discrimination complaints with USPS on October 7, 1997, alleging that their July 1997 reassignment to the P&DC was (1) due to discrimination based on age, sex, race and disability discrimination and (2) in retaliation for participating in the 1991 EEO actions challenging decentralization of the SDM unit.  On June 16, 2000, the administrative judge determined that defendant's reassignment of plaintiffs was in retaliation for their participation in the 1991 EEO actions.  Doc #41, Ex 10 at 47.  The administrative judge also found that removing plaintiffs from their messenger duties resulted in massive service disruptions, cost increases, late delivery of express mail and the necessity of other employees' working substantial overtime.  Id at 35.

On November 12, 2003, the EEOC Office of Federal Operation (OFO) reversed the administrative judge's decision.  Doc #19, Ex E at 1, 7.  On the retaliation claims, OFO concluded that plaintiffs failed to establish a causal link between their participation in the 1991 EEO actions and their reassignment in 1997.  Id at 5.  On the claims for disability discrimination, OFO concluded that the administrative judge's findings were not supported by substantial evidence.  Id.

Plaintiffs filed suit in this court on October 27, 2004, alleging retaliation and discrimination in employment arising from

their July 1997 reassignment to the P&DC.  The first amended complaint alleges that plaintiffs were reassigned to the PD&C in retaliation for their participation in the 1991 EEO actions and class arbitration, in violation of Title VII of the Civil Rights Act of 1964, 42 USC § 2000e et seq, the Age Discrimination in Employment Act (ADEA), 29 USC § 633a, and the Rehabilitation Act of 1973, 29 USC § 791.  FAC ¶¶58-62.  All plaintiffs also allege that the reassignment constituted age discrimination in violation of the ADEA.  Id ¶¶74-76.  Seven plaintiffs further allege disability discrimination in violation of the Rehabilitation Act of 1973, as amended by the Americans with Disabilities Act of 1990 (ADA), 42 USC § 12101 et seq.  Id ¶¶63-73.

The Postmaster moves for partial summary judgment on the age discrimination and retaliation claims.

II

In reviewing a motion for summary judgment, the court must determine whether genuine issues of material fact exist, resolving any doubt in favor of the party opposing the motion.  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  Anderson v Liberty Lobby, 477 US 242, 248 (1986).  Further, the dispute over a material fact must be "genuine," that is, the evidence must be such "that a reasonable jury could return a verdict for the nonmoving party."  Id.  And the burden of establishing the absence of a genuine issue of material fact lies with the moving party.  Celotex Corp v Catrett, 477 US 317, 322-23 (1986).  Summary judgment is granted only if the moving party is

United States District Court

For the Northern District of California

8

United States District Court

For the Northern District of California

1  entitled to judgment as a matter of law.  FRCP 56(c).

2       The nonmoving party may not simply rely on the pleadings,

3  but must produce significant probative evidence, by affidavit or as

4  otherwise provided in FRCP 56, supporting its claim that a genuine

5  issue of material fact exists.  TW Elec Serv v Pacific Elec

6  Contractors Ass'n, 809 F2d 626, 630 (9th Cir 1987). The evidence

7  presented by the nonmoving party "is to be believed, and all

8  justifiable inferences are to be drawn in his favor." Anderson,

9  477 US at 255. "[T]he judge's function is not himself to weigh the

10 evidence and determine the truth of the matter but to determine

11 whether there is a genuine issue for trial."  Id at 249.

12      The evidence presented by both parties must be

13 admissible.  FRCP 56(e).  Conclusory, speculative testimony in

14 affidavits and moving papers is insufficient to raise genuine

15 issues of fact and defeat summary judgment.  Thornhill Publishing

16 Co, Inc v GTE Corp, 594 F2d 730, 738 (9th Cir 1979).  Hearsay

17 statements in affidavits are inadmissible.  Japan Telecom, Inc v

18 Japan Telecom America Inc, 287 F3d 866, 875 n 1 (9th Cir 2004).

19

20                              III

21                          *Retaliation*

22      In order to establish a *prima facie* case of retaliation

23 under Title VII, plaintiffs must adduce evidence that (1) they were

24 engaged in a protected activity, (2) they were thereafter subjected

25 to an adverse employment action and (3) a causal link exists

26 between the protected activity and the adverse employment action.

27 Wallis v J R Simplot Co, 26 F3d 885, 891 (9th Cir 1994).  If

28 plaintiffs establish a *prima facie* case, the "burden of production,

but not persuasion, then shifts to the employer to articulate some legitimate, nondiscriminatory reason for the challenged action." Chuang v University of California Davis, Bd of Trustees, 225 F3d 1115, 1123 (9th Cir 2000).  If the employer meets this burden, the plaintiff must show "that the articulated reason is pretextual either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." Id at 1124 (citation omitted).

## A

Employees engage in protected activity when they act to protect their rights under Title VII.  See Steiner v Showboat Operating Co, 25 F3d 1459, 1464 (9th Cir 1994).  The Postmaster contends that the eight plaintiffs who did not file EEO complaints in 1991 cannot show that they were engaged in protected activity. In response, plaintiffs appear to argue that, as members of the class in the class arbitration, these eight individuals engaged in protected activity.  In reply, the Postmaster contends that the class arbitration did not concern Title VII protections and therefore could not qualify as protected activity.

In Learned v Bellevue, 860 F2d 928 (9th Cir 1988), the Ninth Circuit explained that the anti-retaliation provisions of Title VII protect "only those employees who oppose what they reasonably perceive as discrimination under the Act."  Id at 932. The Learned plaintiff alleged retaliation in violation of Title VII based on a state-law discrimination complaint he had filed with the Washington Human Rights Commission (HRC).  Id at 930.  Affirming

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

1  summary judgment in favor of the defendant, the Ninth Circuit held

2  that, for Title VII retaliation purposes, "the HRC filing does not

3  fall within the protection of [Title VII] * * * because [plaintiff]

4  did not allege discrimination prohibited by Title VII."  Id at 932.

5        The same reasoning applies with greater force to the 1991

6  class arbitration initiated by the APWU, where the issue was

7  whether USPS had violated various, primarily procedural, aspects of

8  a collective bargaining agreement.  Doc #19, Ex B at 1-5.

9  Specifically, the arbitrator framed the issue as follows:  "Did the

10 Postal Service violate Articles 19, 40 and the Special Delivery

11 Craft Memorandum of Understanding of the 1987-1990 Collective

12 Bargaining Agreement?  If so, what is the appropriate remedy?"  Doc

13 #19, Ex B at 1.  The Eaton award addressed only those issues and

14 not any alleged discrimination.  Id.  Moreover, the Learned

15 plaintiff filed the prior complaint on his own behalf.  Here,

16 plaintiffs' only connection to the class arbitration was their

17 membership in APWU, which filed the grievance on their behalf.  Id.

18       The court notes that the Tenth Circuit has concluded that

19 asserting rights under a collective bargaining agreement does not

20 constitute protected activity for purposes of a Title VII

21 retaliation claim.  See Kendrick v Penske Transp Servs, Inc, 220

22 F3d 1220, 1235 n 13 (10th Cir 2000); McKenzie v Renberg's, Inc, 94

23 F3d 1478, 1486 (10th Cir 1996).

24       For these reasons, the court finds that plaintiffs'

25 indirect participation in the class arbitration was not protected

26 activity for Title VII purposes.  Accordingly, the retaliation

27 claims of the eight plaintiffs who did not participate in the 1991

28 EEO actions must fail.

**B**

The Postmaster does not dispute that plaintiffs' filing of the 1991 EEO complaints constituted protected activity under Title VII and that plaintiffs' reassignment to the P&DC constitutes an adverse employment action. Rather, the Postmaster argues that plaintiffs cannot show a causal link between the protected activity and the adverse employment action. MSJ at 10-12.

In order to establish causation, plaintiffs must show "by a preponderance of the evidence that engaging in the protected activity was one of the reasons for [the adverse employment action] and that but for such activity" they would not have been subjected to the adverse employment action. Villiarimo v Aloha Island Air, Inc, 281 F3d 1054, 1064-65 (9th Cir 2002). Plaintiffs may submit direct or circumstantial evidence of causation. See Manatt v Bank of America, 339 F3d 792, 802 (9th Cir 2003).

Causation may be inferred from timing alone "where an adverse employment action follows on the heels of protected activity." Villiarimo, 281 F3d at 1065. But the adverse employment action must have occurred "fairly soon after the employee's protected activity." Id (internal quotation omitted). For example, in Villiarimo, an eighteen-month lapse between the protected activity and the adverse employment action was too long for a court to infer causation. Id. On the other hand, an intervening period of two or three months can be short enough for a court to infer causation. See Yartzoff v Thomas, 809 F2d 1371, 1376 (9th Cir 1987); Miller v Fairchild Indus, Inc, 797 F2d 727, 731-32 (9th Cir 1986).

//

United States District Court

For the Northern District of California

1       The crux of the parties' dispute is whether the June 23,
2  1997, letter in which plaintiffs expressed their intent to
3  reinstate the EEO actions is a relevant event for purposes of
4  timing.  Plaintiffs maintain that it is and that because
5  plaintiffs' reassignment occurred just three weeks later, causation
6  can be readily inferred.  The Postmaster argues that the relevant
7  event is the filing of the complaints in 1991, six years before
8  plaintiffs' reassignment to the P&DC.  The Postmaster relies on
9  Clark County School Dist v Breeden, 532 US 268 (2001), for the
10 proposition that the clock for inferring causation begins ticking
11 when a plaintiff first files an EEO complaint —— and not at any
12 subsequent point in the proceedings triggered by the complaint.

13      In Breeden, the Supreme Court held that issuance of a
14 right-to-sue letter at the close of an EEOC investigation was not
15 the relevant event for inferring causation for two reasons.  First,
16 there was no indication that the employer knew about the right-to-
17 sue letter before taking the allegedly adverse action.  Id at 273.
18 Second and more important for present purposes, if the employer did
19 know about the letter, then the employer also must have known about
20 the filing of the initial complaint in that investigation.  Id.
21 The Postmaster argues that here, too, the supervisors who
22 reassigned plaintiffs knew about the filing of the initial
23 complaint, which therefore must be the relevant event for inferring
24 time-based causation.

25      Plaintiffs argue that "Breeden is inapplicable to the
26 extent that it involves the EEOC private sector procedures, rather
27 than [EEOC governmental procedures]."  But even assuming that
28 Breeden involves "private sector procedures" (which is far from

United States District Court

For the Northern District of California

clear given that the plaintiff there was a state employee suing a public school district), plaintiffs fail to explain, and the court is at a loss to understand, why this distinction renders <u>Breeden</u> inapplicable.

Plaintiffs also maintain that "unlike the facts in <u>Breeden</u>, there were no separate events" between 1991 and 1997, "but rather a continuous process, litigating overlapping issues." Doc #28 (Opp) at 16. To be sure, the facts of <u>Breeden</u> are distinguishable. There, the Court assumed that if the employer was aware of the right-to-sue letter, it would also have been aware of the initial EEO complaint. Here, there is no need for assumptions. Taking the uncharacteristic step of citing to the extensive administrative record they submitted, cf Doc #19, Ex A at 16 (Judge Armstrong emphasizing that plaintiffs in <u>Black v Henderson</u>, represented by plaintiffs' counsel in this case, "<u>fail[ed] to provide any citations to the record</u>"), plaintiffs dedicate several pages of their opposing memorandum to quoting the testimony of Scott Tucker, Bill Leon, George Kikuchi and Linda Shumate and explaining why it is beyond cavil that these individuals had long been aware of the EEO actions. Opp at 11-14. The court agrees that the portions of the record cited by plaintiffs leave little room for doubt that the relevant decisionmakers were aware of the EEO actions well before June 23, 1997. Under these circumstances, and as in <u>Breeden</u>, it is questionable that the June 23, 1997, letter is the relevant event for inferring causation based on temporal proximity.

<u>Breeden</u> is distinguishable in another way that, at first blush, favors plaintiffs. Unlike the right-to-sue letter in

United States District Court

For the Northern District of California

Breeden, plaintiffs' letter almost certainly constitutes protected activity in which plaintiffs clearly took part.  And one could infer —— perhaps reasonably, perhaps not —— that notwithstanding their knowledge of the EEO actions, the relevant decisionmakers might have believed that the EEO actions would never be revived in light of the class arbitration and Eaton award.  In that sense, plaintiffs' June 23, 1997, letter might have been the functional equivalent of initial notice of protected activity and, accordingly, the basis for a new retaliatory motive.

But even under this theory, plaintiffs cannot make out a *prima facie* case.  The uncontested evidence shows that the Postmaster began the process of eliminating the SDM service and the San Francisco SDM units weeks before June 23, 1997.  Leon Decl, ¶¶1, 4-5; id, Ex B at 8, 10.  "Employers need not suspend previously planned transfers upon discovering that a Title VII suit has been filed, and their proceeding along lines previously contemplated, though not yet definitively determined, is no evidence whatever of causality."  Breeden, 532 US at 272.

In sum, plaintiffs' attempt to establish a causal nexus based on temporal proximity fails and, for that reason, so does their *prima facie* case.

C

Even assuming plaintiffs could establish a *prima facie* case, the Postmaster has articulated a legitimate, nondiscriminatory reason for reassigning plaintiffs in 1997.

The Postmaster tenders three interrelated, legitimate, nondiscriminatory reasons for plaintiffs' reassignment to the P&DC:

15

United States District Court

For the Northern District of California

(1) the elimination of SDM service nationwide; (2) the numerous inefficiencies resulting from the low volume of mail the San Francisco SDM messengers were delivering and (3) nationwide postal rules preventing SDM messengers from delivering express mail, which had become plaintiffs' main job after the decline in SDM's popularity.  In other words, there were no more SDM items to deliver, and plaintiffs' delivery of non-SDM items was both inefficient and discouraged by USPS rules.  Their reassignment to the P&DC thus resulted from a reduction in workforce.

A general reduction in workforce is a legitimate, nondiscriminatory business justification evidence of which is by itself sufficient to rebut a *prima facie* case.  See, for example, Coleman v Quaker Oats Co, 232 F3d 1271, 1282 (9th Cir 2000).  Cf Nidds v Schindler Elevator Corp, 113 F3d 912, 918 (9th Cir 1996) (finding that evidence of general workforce reduction was sufficient to rebut *prima facie* case of discrimination under California Fair Employment and Housing Act).  The Postmaster has more than satisfied the burden of producing such evidence.  See *supra* I(B).

D

The burden thus shifts back to plaintiffs to produce evidence sufficient to raise a genuine material fact regarding whether the Postmaster's proffered justification is merely a pretext for discrimination.  Coleman, 232 F3d at 1282.  Plaintiffs may rely on the same evidence used to establish the *prima facie* case or may offer new evidence, but they must do more than merely deny the Postmaster's justification.  Id.  Instead, they must offer

United States District Court

For the Northern District of California

"specific, substantial evidence of pretext." <u>Wallis</u>, 26 F3d at 890 (quoting <u>Steckl v Motorola, Inc</u>, 703 F2d 392, 393 (9th Cir 1983)). Specifically, plaintiffs must produce evidence from which the finder of fact could reasonably conclude that either (1) the alleged reason for the adverse employment action was false or (2) the true reason for the action was a discriminatory one.  <u>Nidds</u>, 113 F3d at 918.

Plaintiffs fail to satisfy this burden.  Indeed, plaintiffs do not present any argument for pretext, at least not explicitly.  But the court can infer from plaintiffs' opposing memorandum that they are relying on the administrative judge's finding of numerous inefficiencies and substantial costs resulting from plaintiffs' unavailability to deliver express mail after their reassignment.  See Opp at 4-5.  In addition, plaintiffs assert that USPS hired new employees and assigned existing employees to deliver express mail following plaintiffs' reassignment.  Id at 4.

Viewed in the light most favorable to plaintiffs, these contentions would not reasonably support the conclusion that the Postmaster's given reason for plaintiffs' reassignment was false or that the Postmaster's true reason was discriminatory.  It is simply unrealistic that USPS abolished the SDM service nationwide and implemented a nationwide rule discouraging SDM messengers from delivering express mail simply to retaliate against twenty-eight SDM messengers in San Francisco.  Further, a failure on the part of the Postmaster to manage optimally the delivery of express mail does not undermine the credibility of his legitimate, nondiscriminatory justification.  See <u>Coleman</u>, 232 F3d at 1285 (holding that unwise business judgments or use of a faulty

17

United States District Court

For the Northern District of California

evaluation system does not support an inference of discrimination). Finally, the fact that the Postmaster assigned other employees to deliver express mail reinforces his legitimate justification for plaintiffs' reassignment:  USPS had eliminated plaintiffs' primary function and needed other employees to perform plaintiffs' secondary duties.  See Wallis, 26 F3d at 892.

In sum, even if plaintiffs established a *prima facie* case of retaliation, they failed to rebut the Postmaster's legitimate, nondiscriminatory justification for the adverse employment action. The Postmaster's motion for summary judgment on plaintiffs' claims for retaliation is accordingly GRANTED.


IV

*Age Discrimination*

A *prima facie* case of age discrimination under Title VII and the ADEA may be based either on direct evidence of discriminatory intent or on a presumption arising from the factors set forth in McDonnell Douglas Corp v Green, 411 US 792 (1973). Wallis, 26 F3d at 889.  Plaintiffs attempt both routes.


A

In short, plaintiffs have not produced direct evidence of discriminatory intent.  Plaintiffs refer to "numerous instances of direct evidence of discrimination including ageist remarks made by USPS managers and supervisors indicating that the reason for abolishing the [SDM] unit was to get rid of older and disabled Messengers."  Opp at 18.  But plaintiffs do not draw the court's attention to any such "instances of direct evidence" in the record.

18

United States District Court

For the Northern District of California

In opposing a motion for summary judgment, plaintiffs must specify and cite to the evidence supporting their argument, rather than hope that the court, reviewing a voluminous record, somehow manages to find it.  See, for example, <u>Carmen v San Francisco Unif Sch Dist</u>, 237 F3d 1026, 1030 (9th Cir 2001).

In any event, it appears that plaintiffs are referring to remarks submitted as evidence in <u>Black v Henderson</u>, C-99-4806 SBA (ND Cal), the case arising from the 1991 decentralization.  See Doc #35 (Reply) at 5.  Judge Armstrong found the remarks insufficient to establish a causal relationship between discriminatory intent and the adverse employment action, primarily because they were made by "first line supervisors" who were "not involved with the decision to decentralize the [SDM] unit."  Doc #19, Ex A at 17.  The court agrees with Judge Armstrong.  Further, tenuous as the connection between the remarks and the 1991 decentralization may be, the connection between those remarks and plaintiffs' reassignment to the P&DC six years later is weaker still.

B

To establish a *prima facie* case of age discrimination under a <u>McDonnell Douglas</u>-type presumption, plaintiffs must demonstrate that they were "(1) members of the protected class (at least age 40); (2) performing their jobs satisfactorily; (3) discharged; and (4) replaced by substantially younger employees with equal or inferior qualifications."  <u>Coleman</u>, 232 F3d at 1281.  But "[w]here, as here, the [adverse employment action] in question results from a general reduction in workforce, [plaintiffs] need not show that they were replaced; rather they need show 'through

19

United States District Court
For the Northern District of California

circumstantial, statistical, or direct evidence that the [adverse employment action] occurred under circumstances giving rise to an inference of age discrimination.'" Id (quoting Rose v Wells Fargo & Co, 902 F2d 1417, 1421 (9th Cir 1990)). Plaintiffs can raise this inference by showing that the employer had a continuing need for their services (in that their various duties were still being performed) or that others not in their protected class were treated more favorably. Wallis, 26 F3d at 891 (citing Washington v Garrett, 10 F3d 1421, 1434 (9th Cir 1993)).

1

Whether USPS had a continuing need for plaintiffs' services turns on the definition of plaintiffs' services. The Postmaster contends that plaintiffs' services consisted of delivering SDM items along with any express mail that they could deliver in the course of their SDM routes —— and only in the course of their SDM routes. See Doc #22 at 15. In the Postmaster's view, once the SDM service had been eliminated, there were no more SDM routes and thus no continuing need for plaintiffs' services. Plaintiffs appear to take the position that their primary duty was to deliver express mail simply because that is what they had been doing since the decline in SDM's popularity. See Opp at 4. See also Leon Decl ¶¶7-8. Under this theory, the assignment of express mail to other employees was the assignment of plaintiff's own services, thus raising an inference of discrimination.

The court is not persuaded by plaintiffs' apparent theory. As their very job title indicates, and as they allege in their complaint, plaintiffs were special delivery messengers. FAC

United States District Court

For the Northern District of California

¶¶4-32.  Moreover, plaintiffs do not contest that postal regulations permit SDM messengers to deliver express mail only in the course of their SDM routes, and that regular letter carriers are to deliver express mail items.  See Doc #23, Ex 9-23 at 23. Plaintiffs have failed to show that USPS had a continuing need for their services and that the transfer of express mail delivery to other employees represented a transfer of plaintiffs' duties.

2

Plaintiffs also fail to persuade the court that others not in their protected class were treated more favorably. Plaintiffs baldly state that USPS "hired new, untrained employees, many of whom were younger than plaintiffs * * * to deliver the Express Mail."  Opp at 4.  But once again, plaintiffs do not cite any evidence for this contention, much less evidence establishing that these employees were younger than 40 years old (that is, outside the protected class).

Accordingly, plaintiffs have failed to produce evidence showing that their reassignment to the P&DC occurred under circumstances giving rise to an inference of discrimination, and they have thus failed to establish a *prima facie* case of age discrimination under Title VII.

C

Even if plaintiffs had proffered evidence suggesting that the employees who were assigned to deliver express mail were not members of plaintiffs' protected class, thus enabling plaintiffs to establish a minimal *prima facie* case based on a <u>McDonnell Douglas</u>

United States District Court

For the Northern District of California

presumption, "the burden of production, but not persuasion, then shifts to the employer to articulate some legitimate, nondiscriminatory reason for the challenged action." <u>Chuang</u>, 225 F3d at 1123.

As already discussed, the Postmaster advances a legitimate, nondiscriminatory reason for plaintiffs' reassignment: a reduction in workforce. See *supra* III(C). And once again, plaintiffs have failed to raise a genuine issue of material fact regarding whether the Postmaster's proffered justification is merely a pretext for discrimination. Specifically, plaintiffs do not offer any evidence of pretext beyond what the court already found to be insufficient in the context of their retaliation claims: express mail service disruptions and the assignment of other employees to deliver express mail.

D

In sum, plaintiffs failed to establish a *prima facie* case of age discrimination. Even assuming the contrary, plaintiffs failed to rebut the Postmaster's legitimate, nondiscriminatory justification for the adverse employment action.

//
//
//
//
//
//
//
//

22

United States District Court

For the Northern District of California

1

                                         v

2          The Postmaster's motion for partial summary judgment on

3    plaintiffs' claims for retaliation and age discrimination is hereby

4    GRANTED.

5

6          SO ORDERED.

7

8                              _____

9                              VAUGHN R WALKER

10                             United States District Chief Judge

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                        23